HUGHES HUBBARD & REED LLP
Daniel H. Weiner
Webster D. McBride
One Battery Park Plaza
New York, NY 10004
(212) 837-6000
weiner@hugheshubbard.com
mcbridew@hugheshubbard.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

THE ARTHUR TAUBMAN TRUST, EUGENIA : 
TAUBMAN and NICHOLAS TAUBMAN, :
  :
                  Plaintiffs, :
  :
         -against- : 13 Civ. 3011 (PGG) (HBP)
  :
KNOEDLER GALLERY, LLC d/b/a : 
KNOEDLER & COMPANY, 8-31 HOLDINGS, : **AMENDED COMPLAINT**
INC., ANN FREEDMAN, MICHAEL :
HAMMER, GLAFIRA ROSALES and JOSÉ :
CARLOS BERGANTIÑOS DIAZ, :
  :
                Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiffs Eugenia Taubman, Nicholas Taubman (together, the

"Taubmans") and The Arthur Taubman Trust (the "Trust," and together with the

Taubmans, "Taubman" or "plaintiffs"), by and through their undersigned attorneys,

complaining of defendants Knoedler Gallery, LLC d/b/a Knoedler & Company

("Knoedler"), 8-31 Holdings, Inc. ("8-31"), Ann Freedman ("Freedman"), Michael

Hammer ("Hammer"), Glafira Rosales ("Rosales") and José Carlos Bergantiños Diaz

("Diaz") (collectively, "defendants"), allege as follows:

**NATURE OF THE ACTION**

1.      This action arises from defendants' sale of forged art.  In November 2005, plaintiffs purchased from Knoedler for $4.3 million an Abstract Expressionist painting (the "Painting") purportedly created by the well-known American artist Clyfford Still ("Still").  To induce plaintiffs' purchase, Knoedler's then–Director and President, Freedman, fed plaintiffs an elaborate story involving bi-continental aristocracy, secret romance, and a truly remarkable inheritance.  In reality, virtually everything Knoedler and Freedman told plaintiffs about the Painting was false, and the Painting's origin myth was exactly that:  the collective invention of defendants.

2.      Knoedler's sale of the Painting to Taubman in 2005 was but one in a series of frauds defendants perpetrated on the art-collecting public over the course of approximately fifteen years.  Defendants, working together, each played an important role in the operation of a coordinated enterprise designed to exploit its members' talents, reputations and connections in order to reap enormous profits from the sale of fakes.

3.      Ultimately, defendants' scheme unraveled publicly.  In September 2009, a grand jury issued subpoenas to Knoedler and Freedman seeking information about the sale of paintings Rosales had brought to Knoedler; shortly thereafter, Hammer dismissed Freedman.  In November 2011, after collector Pierre Lagrange ("Lagrange") delivered to Knoedler a forensic report declaring one such Rosales-sourced painting a forgery, Hammer abruptly shut Knoedler's doors after 160 years of

business.[1]  The next day, Lagrange sued Knoedler for over $15 million.  On May 20, 2013, Rosales was arrested and charged in a criminal complaint with tax fraud, among other things.  That criminal complaint alleged that Rosales, along with an associate, sold forged paintings to two prominent Manhattan art galleries, one of which is clearly identifiable as Knoedler; a superseding indictment subsequently obtained by the Government (the "Superseding Indictment") characterized the distribution and sale of those forged paintings as a "conspiracy."  On September 16, 2013, Rosales pled guilty to all nine counts in the Superseding Indictment.  At the plea hearing, Rosales admitted:

> From in or around the 1990s through 2009 . . . I agreed with others to sell works of art claimed to be created by various [E]xpressionist artists . . . and to make false representations as to the authenticity and provenance of those works.

4.      Time and time again, forensic analysis has confirmed what Rosales acknowledged in her guilty plea:  artworks that defendants foisted on the public, including the Painting, are not what defendants purported them to be — modern-art masterworks — but are instead forgeries.

5.      This is an action for (a) defendants' violation of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); (b) defendants' violation of the New York State Arts and Cultural Affairs Law and General Business Law; and (c) various common-law causes of action related to defendants' breach of warranty and fraud.  Plaintiffs bring this action for compensatory

---

[1]      Knoedler is the successor-in-interest to M. Knoedler & Co. and Knoedler-Modarco, Inc., each of which did business as "Knoedler & Co."

and punitive damages arising from defendants' fraudulent sale of the Painting and their operation of a corrupt enterprise.

## THE PARTIES

6.     Eugenia Taubman and Nicholas Taubman are husband and wife residing in Roanoke, Virginia.

7.     The Trust was originally organized under the laws of the Commonwealth of Virginia and is currently a trust subject to the laws of the State of South Dakota and located in Sioux Falls, South Dakota.  The Trust has three trustees: Dennis A. Barbour, an individual residing in the City of Roanoke, Virginia; John G. Rocovich, Jr., an individual residing in Roanoke County, Virginia; and First Premier Bank, a corporation organized and existing under the laws of the State of South Dakota with its principal place of business at 6010 South Minnesota Avenue, Sioux Falls, South Dakota.  The Trust's beneficiary is plaintiff Nicholas Taubman and, on his death, his issue.  From January 1, 1990 until February 4, 2011, Eugenia Taubman was a trustee of the Trust.

8.     None of Eugenia Taubman, Nicholas Taubman and the Trust is an art merchant or is in the business of buying and selling art.

9.     On information and belief, Freedman resides in New York, New York.

10.     On information and belief, Hammer resides in or near Santa Barbara, California, although he lists his address with the New York Secretary of State as 9510 Jefferson Boulevard, Culver City, California.

11.     On information and belief, Rosales resides in or near Sands Point, New York.

12.     While Diaz's last known residence is in or near Sands Point, New York, he has recently been arrested in Seville, Spain, and on information and belief is in the custody of the Spanish government.

13.     8-31 is a corporation organized under the laws of the State of Delaware that lists its most recent principal place of business with the New York Secretary of State as 19 East 70th Street, New York, New York, but which on information and belief is actually located at 444 West 55th Street, New York, New York. On information and belief, Hammer is, and was at all relevant times, the President and sole owner of 8-31, and Freedman was a Director of 8-31 at all relevant times prior to Hammer's dismissal of her in Fall 2009.

14.     Knoedler is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 444 West 55th Street, New York, New York.  Until its abrupt closure in 2011, Knoedler was one of the world's preeminent art galleries.  On information and belief, 8-31 is, and was at all relevant times, Knoedler's sole owner and alter ego; Hammer directs, and at all relevant times directed, Knoedler's operations; and Freedman was Knoedler's Director and President at all relevant times prior to her abrupt dismissal in Fall 2009.

## JURISDICTION AND VENUE

15.     The Court has personal jurisdiction over defendants pursuant to N.Y.C.P.L.R. § 301.  To the extent that any defendant is not located in the State of New

York, this Court also has personal jurisdiction pursuant to N.Y.C.P.L.R. § 302(a),

because this action arises out of the transaction of business in the State of New York.

16.    The Court has diversity jurisdiction over this action pursuant to 28

U.S.C. § 1332(a)(1) because the action is between citizens of different states and the

amount in controversy exceeds $75,000, exclusive of interest and costs.

17.    In addition, the Court has federal question jurisdiction over the

RICO claims in this action pursuant to 18 U.S.C. § 1964(a) and 28 U.S.C. § 1331, and over

the remaining claims pursuant to 28 U.S.C. § 1367(a).

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to plaintiffs' claims

occurred in this District.

## FACTUAL ALLEGATIONS

### Origins of Defendants' Enterprise

19.    At some point no later than the early 1990s, on the streets of lower

Manhattan, Diaz met an artist named Pei-Shen Qian ("Qian") while Qian was painting

portraits of passersby.  Impressed by Qian's artistic ability, Diaz began soliciting from

Qian paintings in imitation of the work of various renowned modern artists.  Over the

course of the next two decades, Diaz brought to Qian a steady stream of orders for

dozens of such paintings.

20.    Diaz paid Qian commissions eventually ranging from five to eight

thousand dollars per work, drawing from Diaz's own personal funds as well as from

the account of the art-dealing business he co–owned and operated with Rosales.

21.     Diaz provided to Qian materials on which Qian painted some of the works, such as canvases from old paintings that Diaz acquired at art auctions, and masonite from old furniture that Diaz purchased at flea markets.

22.     To each finished work, Diaz or Qian would apply the forged signature of the artist after which it had been painted.  Diaz would then artificially treat the works to enhance the plausibility of their being decades, rather than days or weeks, old.

23.     In or about 1994, Hammer appointed Freedman the Director and/or President of Knoedler.  Shortly thereafter, a Knoedler employee named Jaime Andrade ("Andrade") introduced Freedman to Rosales.

**1994–98: The Vijande Collection**

24.     In or about 1994, Rosales began to bring to Knoedler for consignment a series of previously undocumented works to which she ascribed a purported provenance involving the Vijande Gallery in Madrid, Spain (the "Vijande Collection").  At least five of these Vijande Collection works were purportedly by the well-known artist Richard Diebenkorn ("Diebenkorn").[2]

25.     Soon after Rosales brought to Knoedler the first Vijande Collection "Diebenkorns," Freedman met with representatives of Diebenkorn's family and estate, After viewing two of the works, the representatives expressed to Freedman reservations about those works' authenticity and purported provenance.

---

[2]     Knoedler purchased from Rosales and resold four additional Vijande Collection works: three purportedly by Sam Francis and one purportedly by Andy Warhol.

26.     Despite the stated skepticism of the Diebenkorn family and estate and an utter lack of documentation substantiating the works' authenticity and purported provenance, Knoedler and Freedman did not seek independent corroboration of Rosales's provenance story.  If they had, they would have discovered that Rosales's story was implausible.[3]

27.     Instead, between 1994 and 1998, Knoedler and Freedman sold the five Vijande Collection "Diebenkorns" without telling any of the buyers about the doubts that the Diebenkorn family and estate had expressed.

**1996–2009: The Rosales Collection**

28.     Beginning in or about 1996, soon after the Diebenkorn family and estate expressed skepticism about works from the Vijande Collection, Rosales told Freedman that she had gained access to a second collection of paintings by leading American Abstract Expressionist artists (the "Rosales Collection"), this one owned by a Mexican friend whose identity she had sworn to keep secret.[4]  Rosales claimed that these paintings had been acquired by her friend's father, an art collector whom Rosales and Freedman began to refer to as "Mr. X."  Rosales further claimed that her friend had inherited the paintings when Mr. X passed away, but that he was not interested in art and wished to sell them.  Rosales did not have any documentation of Mr. X's

---

[3].     In 2013, *Vanity Fair* interviewed the son of the late owner of the Vijande Gallery, who found "incredible" the story linking these works to his father's gallery.

[4].     The Rosales Collection did not include any works purportedly created by Diebenkorn.

acquisition of the paintings or any other support or corroboration for her story or for the works' purported provenance.

29.     Rosales's tale was so far-fetched that Freedman, who was highly experienced in the purchase and sale of artwork, could not have reasonably believed it to be true, and, on information and belief, she did not.

30.     Freedman gave Mr. X the nickname "Secret Santa."

31.     Despite Rosales's highly suspicious story, Knoedler and Freedman did not investigate the background of Rosales or of her business partner Diaz.  If they had, they would have learned that Diaz had been associated with disreputable art world activities, including the peddling of forgeries and the failure to pay for works purchased at auction.

32.     Rosales and Diaz were willing to sell works from the Rosales Collection to Knoedler at a fraction of the price for which Freedman, with the force of Knoedler's reputation behind her, could sell them when marketing them as authentic works by renowned Abstract Expressionist painters.

33.     Under Hammer's supervision and management, Knoedler and Freedman began to accept works from the Rosales Collection and sell them to unsuspecting buyers.  Freedman used bits of Rosales's original story regarding the works' provenance, and, where necessary, buttressed the tale with additional made-up information.

34.     In an attempt to create cover for defendants' scheme, should it ever be investigated, Freedman began to write internal memos to a file (the "Rosales File") in

9

which she documented changes made to the provenance story that Knoedler told to buyers, concocted explanations for suspicious new facts as they came to light, and attempted to refute arguments that threatened to expose defendants' lies.

*1996–2000: The Rosales Collection's Evolving Provenance and Inventory*

35.    In or about December 1996, Knoedler acquired its first Rosales Collection work:  a purported work by Mark Rothko ("Rothko"), purchased from Rosales for $225,000.  Approximately four months later, Freedman acquired this "Rothko" from Knoedler in an "even trade" for a Diebenkorn that she had purchased in 1991 for $100,000. [5]

36.    In or about February 1998, a prospective Knoedler client cancelled what would have been Knoedler's third sale of Rosales Collection works to an outside client.  The prospective client had agreed to purchase two Rosales Collection works — a "Rothko" (the "Cancelled Rothko") and a "Kline" (the "Cancelled Kline") — but cancelled after learning from Freedman that Knoedler was unwilling to provide the name of "the original collector who acquired the works in 1960."

37.    Knoedler's February 1998 invoice for the Cancelled Rothko and the Cancelled Kline characterized those works' provenance as follows:

**PROVENANCE**  (for both) :  Private Collection, Mexico

38.    On or about June 18, 1998, in the aftermath of this cancelled sale, Freedman met with Rosales to flesh out the backstory of the Rosales Collection.

---

[5]    Six months later, Knoedler would purchase a second, smaller "Rothko" from Rosales for $150,000 and resell this work, within the same month, for $360,000.

Knoedler employee Melissa De Medeiros ("De Medeiros") was present for that meeting and documented the discussion in a memo (the "June 18 Memo"). The June 18 Memo records various details about Mr. X's purported background, family, acquaintances and businesses, as well as the facts that "his American paintings were acquired directly from the artists"; that his son, the current owner of the collection, "maintain[ed] residences in Mexico City . . . and Zurich"; and that although there had once existed letters written between the artists and Mr. X, these had all been "disposed of" after Mr. X's death. On information and belief, Rosales provided no evidence of these elaborations and Freedman did not request any.

39.     The June 18 Memo does not refer to any intermediary between Mr. X and the artists from whom Mr. X purportedly "acquired directly" the works in his collection.

40.     During this June 18 meeting, Rosales stated that the Rosales Collection contained seven or eight paintings, including five by Abstract Expressionist artists of interest to Knoedler:  two by Willem de Kooning ("de Kooning"), one by Robert Motherwell ("Motherwell"), one by Barnett Newman ("Newman"), and one by Still.[6]  According to the June 18 Memo, Freedman "asked if there was a [work by Jackson] Pollock."

---

[6]     The remaining works were purportedly by Adolph Gottlieb (one work) and Alexander Calder ("one or two" works).

11

41. On or about July 1, 1998, Knoedler resold the Cancelled Rothko (to a different client). The invoice for this sale characterized the provenance of the Cancelled Rothko as follows:

> **Provenance []**
> Acquired directly from the Artist in the early 1960's.
> Private Collection, Mexico and Switzerland

42. On or about August 5, 1998, Freedman had another conversation with Rosales about the Rosales Collection. This conversation was also documented in a Knoedler memo (the "August 5 Memo"). According to the August 5 Memo, Rosales stated that eight paintings were "still in that collection," including six by the painters of interest to Knoedler: one by Motherwell, two by Newman, two by Still, and — as a fortuitous answer to Freedman's question from two months earlier — one by Jackson Pollock ("Pollock").[7]

43. The August 5 Memo does not state or suggest that any person acted as an intermediary between Mr. X and the artists.

44. Subsequent to August 5, 1998, Knoedler purchased or accepted on consignment at least *twenty-three* additional works from the Rosales Collection, despite having been told on two separate occasions in 1998 that that collection contained only eight works total (and only five or six by the Abstract Expressionists purportedly responsible for those twenty-three works).

---

[7]. At this time, the remaining works were purportedly one each by Adolph Gottlieb and Milton Avery.

*2000–03: The Ossorio Connection*

45.    At some time in 1999 or early 2000, defendants sought to further bolster the plausibility of the Rosales Collection's purported provenance by linking the collection to an identifiable figure from the art world of the Abstract Expressionist period.

46.    Alfonso Ossorio (1916–1990) ("Ossorio") had been a Filipino artist and collector who lived near Pollock on Long Island and was friends with Rothko, Still and other artists whose works were represented in the Rosales Collection.

47.    In Freedman's own words, she and Knoedler "surmised" that Mr. X might have purchased the works at issue not alone but rather through or with the advice of Ossorio, and Freedman then "presented this view to Rosales."

48.    On or about January 19, 2000, Mr. X's son purportedly "confirmed," through Rosales, that Freedman's notion was exactly right — Mr. X's family had known Ossorio well, and Mr. X had indeed purchased these works "through" Ossorio.

49.    In or about August and September 2000, Freedman purchased two Rosales Collection works directly from Rosales: a "Motherwell," for $15,000, and a "Pollock," for  $280,000.  These prices were exceptionally low; by comparison, in 2001, Knoedler sold a Rosales Collection "Pollock" for $2,000,000, or seven times what Freedman had paid only a year earlier; and in 2006, Knoedler sold a Rosales Collection "Motherwell" for $2,200,000, or *one hundred and forty-seven* times as much as Freedman had paid for her "Motherwell."   Nevertheless, having purchased her own Rosales

13

Collection works (along with the Rothko she had acquired in an "even trade" in 1998), Freedman could now reassure potential clients about the trustworthiness of that collection by letting them know that she herself had bought and owned works from it. Freedman would go on to do exactly this on multiple occasions, always declining to note the remarkable bargain prices she had paid for her comparable works.

50.     Beginning no later than June 2001, Knoedler employees and consultants attempted to identify facts that could lend credence to Mr. X having acquired his Abstract Expressionist collection with the help of Ossorio.  They found no corroborating evidence linking any Rosales Collection work to Ossorio, linking Ossorio to any Swiss/Mexican collector who might have purchased those works, or even confirming any record of any Rosales Collection work prior to its arrival at Knoedler.

51.     Nevertheless, beginning no later than December 2001, Knoedler began to associate Ossorio's name with the provenance of Rosales Collection works.

52.     Changing a provenance is highly unusual and outside the norm of typical practice for an art dealer.  In addition, because a provenance is specifically meant to reflect the previous owners of a work of art, it is not customary for an art dealer to identify an agent in a work's provenance.

53.     Based on Knoedler's records, prior to Freedman's insertion of an intermediary (*i.e.*, Ossorio, and later David Herbert) into the Rosales Collection's provenance tale, the average price at which Knoedler sold Rosales Collection works to outside clients was approximately $750,000, at an average markup of approximately 180%.

14

54. Based on Knoedler's records, the average price at which Knoedler sold Rosales Collection works after Freedman's insertion of an intermediary into the provenance tale was over $5,000,000, at an average markup of over 580%.

***2001–03: The Green Pollock***

55. In 2003, Knoedler was forced to unwind its sale of a Rosales Collection work purportedly by Jackson Pollock (the "Green Pollock") after a well-respected art organization, the International Foundation for Art Research ("IFAR"), released a report (the "IFAR Report") refusing to certify that painting's authenticity and casting serious doubt on its purported provenance.

56. Pursuant to an invoice dated March 9, 2001, Knoedler purchased the Green Pollock from Rosales and Diaz for a price of $750,000.

57. Pursuant to an invoice dated December 21, 2001, Knoedler sold the Green Pollock to Jack Levy, then the co-chairman of mergers and acquisitions at Goldman Sachs, for a price of $2 million.   That invoice indicated the provenance of the Green Pollock as follows:

> **Provenance []**
> The Artist
> Alfonso Ossorio
> Private Collection, Switzerland (by descent to present owner)
> Knoedler & Company, New York

58. The contract of sale was accompanied by a rider acknowledging that Levy would submit the work to IFAR and that Knoedler would accept return of the

painting if "the authorship of this work is proven by IFAR to be misattributed" to Jackson Pollock.

59.    To induce Levy's purchase of the Green Pollock, Knoedler and Freedman falsely represented that the work was a genuine Pollock and that the work had been acquired by its owner's father, a Swiss art collector, through Ossorio.

60.    In 2002, following Knoedler's sale of the Green Pollock to Levy, Hammer rewarded Freedman with a substantial increase in her profit-sharing percentage, from 16% to 25%.

61.    The IFAR Report, dated October 9, 2003, concluded, *inter alia*, that the "negatives" concerning the authenticity of the Green Pollock were "very convincing," that sufficiently "serious" concerns had arisen about the authenticity of the signature that the signature was considered "suspect," and that "too many reservations exist to make a positive attribution to Jackson Pollock."  The IFAR Report further stated that it was "inconceivable" that the Green Pollock had passed through Ossorio's hands yet had never been added to the Pollock *catalogue raisonné*.

62.    Following the IFAR Report, in accordance with the parties' agreement, Knoedler repurchased the Green Pollock.

63.    Freedman sent the IFAR Report to Hammer.  By his own admission, Hammer reviewed the IFAR Report "very carefully."

64.    Hammer and Freedman scheduled a discussion regarding the IFAR Report and its implications.  In anticipation of that discussion, Knoedler and 8-31 CFO Peter Sansone ("Sansone") and Hammer Galleries executive Richard Lynch ("Lynch")

16

sent Hammer a memo outlining various questions for Hammer to raise with Freedman. That memo acknowledged that the IFAR Report had raised questions about the Green Pollock's "authenticity" and "authorship," and noted that "IFAR is held in high esteem by galleries, museums and the art world in general."  Hammer reviewed this memo carefully, raising a question in a follow-up email about certain mathematical calculations at the bottom of the memo regarding future investments in the work.

65.    Despite the fact that Rosales's story had been discredited by a well-respected art organization, Hammer and Freedman decided to continue marketing and selling works from the Rosales Collection.

66.    Hammer, Knoedler and Freedman decided to co-invest in the Green Pollock with a Canadian individual named David Mirvish ("Mirvish").  In a fax cover to Hammer dated December 15, 2003, Freedman discussed the willingness of Mirvish to invest in the work.  A handwritten note on the reverse side of the fax cover sheet contains the following phrases in quotation marks:  "discreet sources are my stock in trade," "don't kill the goose that's laying the Golden egg," and "I am not going to change my way of doing business.  If you are not [comfortable] — step away."  The location of this handwritten note strongly suggests that Freedman was quoting comments made by Hammer.

67.    Hammer has testified that he personally "insisted" that David Mirvish be provided a copy of the IFAR Report.  However, by his own admission, Hammer never took any steps to ensure that other, subsequent potential purchasers of

17

the Green Pollock — or of any other Rosales Collection work — were provided with a copy of the IFAR Report.

68.     In fact, no subsequent actual or potential purchaser of a Rosales Collection work — even of the Green Pollock itself — was ever provided a copy of the IFAR Report.  Knoedler and Freedman did not disclose to any other prospective buyers of Rosales Collection works the fact that IFAR had challenged the authenticity of, and rejected the purported provenance of, a painting from that same collection.

*2004–09: The Herbert Connection*

69.     With the Ossorio tale discredited, defendants worked together to come up with a new provenance story to tell prospective purchasers.  Knoedler employee Andrade had been a very close friend of David Herbert ("Herbert"), a deceased New York art dealer, and had served as the executor of Herbert's estate. Defendants decided to tell customers that Herbert, not Ossorio, had acted as the intermediary between the artists and the mysterious Swiss/Mexican collector.

70.     With the provenance story changed, Freedman created an internal document entitled "Notes on David Herbert" for the Rosales File that attempted to explain how Herbert was connected to each of the Rosales Collection artists.

71.     Freedman sought to make it appear as though there were some support for the story by adding to the Rosales File copies of documentation from the Herbert estate regarding Herbert's art gallery.

72.     None of the Herbert estate documentation Freedman added to the Rosales File actually ties Herbert to any of the paintings in the Rosales Collection.

18

73.     Despite the fact that IFAR had expressly stated that it would be willing to consider additional evidence regarding the provenance of the Green Pollock, no one from Knoedler ever told IFAR that Knoedler was now convinced that Herbert, rather than Ossorio, had been Mr. X's advisor.

74.     Conversely, subsequent purchasers were never told that a key element in an earlier incarnation of the Rosales Collection's provenance tale had been rejected by IFAR and subsequently abandoned by Knoedler.

**Defendants Defraud Taubman**

*Knoedler's 2004 Purchase of the "Still" from Rosales*

75.     On or about December 22, 2004, Knoedler purchased the Painting from Rosales for $600,000.[8]  According to the invoice Knoedler sent to Rosales (the "Knoedler Payment Invoice," a true and correct copy of which is attached hereto as Exhibit B), Knoedler paid Rosales $9,000 in cash and $11,000 by check, and conveyed the remaining $580,000 by wire transfer.

76.     On information and belief, Knoedler made the $9,000 cash payment for the purpose of helping Rosales avoid a requirement (set forth in 31 U.S.C. § 5234) that cash transactions in excess of $10,000 be reported.

77.     Knoedler conveyed the $580,000 wire transfer by international wire to Diaz's brother in Spain.

---

[8].    Photographs of the front and back of the Painting are attached hereto as Exhibit A, and are incorporated herein by reference.

78.    The Knoedler Payment Invoice set forth no prior provenance at all, much less a private Swiss owner or Herbert.

79.    No genuine work of art by Still with a $4.3 million retail sale value could have been purchased in good faith in 2004 for $600,000.  The price that Knoedler paid by itself raises substantial issues concerning the authenticity of the Painting.

80.    Knoedler and Freedman acquired the Painting either with actual knowledge that the Painting was a forgery or while consciously disregarding facts, such as the inexplicably low purchase price and utter lack of accompanying documentation, that raised substantial questions about the Painting's provenance and authenticity.

*The 2005 ADAA Art Show*

81.    In February 2005, Knoedler participated in the Art Dealers Association of America's annual Art Show at the New York Armory on Park Avenue in New York City (the "ADAA Art Show").  Among the works of art that Knoedler displayed and offered for sale at the ADAA Art Show was the Painting, which Knoedler attributed to Still.

82.    Eugenia Taubman, then a trustee of the Trust, visited the ADAA Art Show with Thea Westreich ("Westreich") — who through her company Art Advisory Services acted as Taubman's art consultant — and one of Westreich's associates.  There, Eugenia Taubman, Westreich and Westreich's associate viewed the Painting and discussed the Painting with Freedman.

83.    At the ADAA Art Show, Freedman told each of Taubman, Westreich and Westreich's associate one or more of the following, among other things:

20

(a)     the Painting was the 1949 creation of Clyfford Still;

(b)     a Swiss collector had purchased the Painting directly from Still's studio with the help of Herbert;

(c)     that collector had amassed a collection of Abstract Expressionist paintings, each of which he had acquired directly from its respective artist with Herbert's assistance;

(d)     that collector had passed away, and his children had inherited his art collection;

(e)     that collector's children were the current owners of the Painting, which they now sought to sell; and

(f)     that collector was of a well-known aristocratic family, but Freedman could not reveal his identity, because his children wished for their father to remain anonymous on account of his clandestine romantic involvement with Herbert.

84.     Westreich arranged with Freedman for Knoedler to bring the Painting to the Taubmans' apartment in New York City in or about March 2005, so that the Taubmans could "live with it" while deciding whether Taubman would buy it.

85.     While the Taubmans deliberated, Art Advisory Services researched the Painting.  In response to its inquiries, Knoedler sent Art Advisory Services a condition report on the Painting from Cranmer Art Conservation, Inc., dated December 10, 2004.  That report notes that the Painting "is in remarkably good condition," and gives no indication that the Painting might not be a genuine Still.

*Taubman Purchases the Painting*

86.     Beginning in or about April 2005, Taubman negotiated the purchase price for the Painting with Freedman.  In or about October 2005, Taubman and Freedman agreed that the purchase price for the Painting would be $4,300,000.

21

87.     On or about November 7, 2005, Freedman, on behalf of Knoedler, signed a letter of agreement generated by Art Advisory Services in connection with Knoedler's sale of the Painting to Taubman (the "Letter of Agreement," a true and correct copy of which is attached hereto as Exhibit C).  In signing the Letter of Agreement, Knoedler and Freedman represented, among other things, that the Painting was the 1949 creation of Clyfford Still and that "[f]ull provenance, bibliography, and exhibition history on the [Painting], where available, shall be provided by [Knoedler]."

88.     Later that same day, Knoedler sent Taubman an invoice for sale of the Painting seeking payment in the amount of $4,300,000 (the "Knoedler Invoice," a true and correct copy of which is attached hereto as Exhibit D).

89.     The Knoedler Invoice reiterated Knoedler and Freedman's misrepresentations regarding the Painting's provenance and authenticity:

> **Clyfford Still (American; 1904-1980)**
> *Untitled*
> 1949
> Oil on canvas
> 52 x 36 inches
> Signed and dated on verso: "Clyfford 1949"
> A 12373
>
> **<u>Provenance</u>**
>
> The Artist (David Herbert as agent)
> Private Collection
> By descent to present owner

90.     On or about November 15, 2005, pursuant to the Knoedler Invoice, Taubman caused $4,300,000 to be sent via interstate wires from the Trust's account at Wachovia Bank to Knoedler's account at HSBC Bank.

22

91.     In or about December 2005, Knoedler's Vice President, Per Haubro Jensen, delivered the Painting to Taubman in Bucharest, Romania, where the Taubmans were living on diplomatic assignment from the United States government.

92.     The Trust currently owns the Painting.

93.     The representations and warranties provided by Knoedler and Freedman concerning the authenticity of the Painting were false.

94.     The representations and warranties provided by Knoedler and Freedman concerning the authenticity of the Painting were provided knowingly or with conscious or reckless disregard for their truth.

95.     The provenance story provided by Knoedler and Freedman for the Painting is false.

96.     The false provenance provided by Knoedler and Freedman for the Painting was provided knowingly or with conscious or reckless disregard for its truth.

97.     Taubman relied on the representations and warranties that Knoedler and Freedman made to it and to Westreich in agreeing to purchase the Painting.  Taubman continued to rely on those representations and warranties by, *inter alia*, insuring the Painting at amounts consistent with the high value placed on the Painting by Knoedler and Freedman.

98.     Taubman's reliance on the representations and warranties of Knoedler and Freedman was reasonable because of Knoedler's and Freedman's reputations and their representation that the Painting's owner had insisted on remaining anonymous.

23

99.     Taubman would not have purchased the Painting if it had known that each of the representations and warranties of Knoedler and Freedman set forth above was false in material respects.

100.    Westreich would have stopped all efforts to assess the Painting and would have advised Taubman not to purchase it if she had known that each of the representations and warranties of Knoedler and Freedman set forth above was false in material respects.

101.    Ultimately, Knoedler made a gross profit of $3.7 million on its sale of the Painting to Taubman.  This is a gross profit margin of 86%, which is far above the norm in the art trade.

***Knoedler and Freedman Fraudulently Concealed Material Facts from Taubman***

102.    In order to induce Taubman to purchase the Painting, Knoedler and Freedman intentionally concealed material facts that they knew, but Taubman and Westreich did not and could not know.

103.    Knoedler and Freedman were aware of numerous facts that cast significant doubt on the Painting's purported provenance and raised red flags about the Painting's authenticity, including that:

> (a)     Knoedler itself owned the Painting;
>
> (b)     the Painting had been delivered to Knoedler by Rosales;
>
> (c)     neither Freedman nor anyone else at Knoedler had ever seen any evidence substantiating the provenance story provided for the Painting (*e.g.*, any evidence that Mr. X or his children ever existed, or that Herbert had ever facilitated a sale directly from Still to a collector);

24

(d)    neither Freedman nor anyone else at Knoedler even knew the name of Mr. X or his children;

(e)    Ossorio had initially been identified as having facilitated the sale of Rosales Collection works to Mr. X, but there was no record of Ossorio having any connection with any Rosales Collection works;

(f)    the Diebenkorn Foundation had expressed doubts about other works from the Rosales Collection;

(g)    questions and doubts raised by IFAR about the authenticity and provenance of another work from the Rosales Collection had led to cancellation of Knoedler's sale of that work; and

(h)    the vast majority of sale proceeds paid by Knoedler to Rosales for the Painting — and for other Rosales Collection works — had been sent to Spain to Diaz's brother.

104.    In light of their knowledge of these and related facts, Knoedler and Freedman knew, should have known, or at minimum recklessly disregarded the likelihood that the Painting was a forgery.

105.    Knoedler had superior knowledge of each of these facts.  Knoedler knew that each of these facts was not otherwise available to Taubman or Westreich and that, as a result, Taubman was deciding whether to purchase the Painting on the basis of incomplete and materially misleading information.

106.    Had Taubman known these facts about the Painting and its background, it would not have purchased the Painting.

107.    Had Westreich known these facts about the Painting and its background, she would have stopped all efforts to assess the Painting and would have advised Taubman not to purchase it.

108.    Knoedler could not have sold the Painting for $4.3 million to a prospective purchaser to whom it had disclosed these facts.

109.    Knoedler did not disclose these facts to Taubman or Westreich.

110.    In the years subsequent to defendants' sale of the Painting to Taubman, Knoedler and Freedman never once communicated with Taubman to correct their misrepresentations, to disclose the truth about the Painting's origin, or to communicate regarding events (*e.g.*, those discussed below) that further cast significant doubt on the Painting's authenticity and provenance.

## 2006-2010:  Defendants Whitewash Emerging Indications of Inauthenticity

### *The Kemper Museum Removes a Vijande Collection "Diebenkorn"*

111.    In 2006, Richard Grant ("Grant"), the head of the Diebenkorn Foundation, learned that the Kemper Museum of Contemporary Art, in Kansas City, Missouri (the "Kemper Museum"), was displaying a Vijande Collection "Diebenkorn" (the "Kemper Diebenkorn") purchased from Knoedler in 1997.

112.     Concerned that the Kemper Diebenkorn was not authentic, Grant attempted to contact Freedman to discuss.  Freedman was unresponsive to Grant's inquiries.

113.    Grant then contacted the Kemper Museum.

114.    Shortly thereafter, the Kemper Museum removed the Kemper Diebenkorn from public display.

115.    In its place, the Kemper Museum put a Diebenkorn work that Freedman gifted to the museum.

26

116.     Knoedler and Freedman declined to notify any prior or subsequent Rosales or Vijande Collection customer that the Kemper Museum, under advisement from the Diebenkorn Foundation,  had removed from public display a work that Knoedler had acquired from Rosales.

**The Dedalus Foundation Deems Rosales Collection "Motherwells" Inauthentic**

117.     One year after the Kemper Museum replaced a Vijande Collection "Diebenkorn," and four years after the IFAR Report, another renowned organization questioned the authenticity of works that Rosales had introduced to the market.  In December 2007, the Dedalus Foundation ("Dedalus"), a not-for-profit organization created by Motherwell that was undertaking the creation of a Motherwell *catalogue raisonné*, examined a group of seven Rosales Collection works purportedly painted by Motherwell, four of which Knoedler had handled.  After over a year of extensive discussions with Freedman regarding the works' provenance, and after reviewing forensic analysis of the works, Dedalus deemed the works "highly suspect and anomalous," concluded that "it was significantly unlikely that any of the [Rosales Collection Motherwells] were the work of Motherwell," and decided that these works would not be included in the Motherwell *catalogue raisonné*.

118.     Knoedler and Freedman declined to notify any prior or subsequent Rosales or Vijande Collection customers that Dedalus had found inauthentic numerous works brought to market by Rosales.

*Knoedler Comes Under Investigation and Hammer Fires Freedman*

119.   In or about 2009, the United States Attorney's Office for the Southern District of New York began to investigate defendants' activities.  In September 2009, a grand jury empaneled in connection with this investigation issued subpoenas to Knoedler and Freedman seeking information about the Rosales and Vijande Collections.

120.   Shortly thereafter, Hammer dismissed Freedman.

121.   Under Hammer's direction, Knoedler carefully managed Freedman's departure — which attracted significant press attention, and which Knoedler styled as Freedman's "resignation" — to ensure that no connection could be drawn between that departure and the Rosales Collection works that Knoedler had been peddling for more than a decade.

122.   Hammer, in his role as Chairman of Knoedler, sent a letter dated October 27, 2009 to Knoedler customers — including to Westreich, at the time still Taubman's advisor — informing them that Freedman had "resigned."  Hammer's letter was attached to a cover letter from Freedman's replacement, Frank Del Deo, stating that the gallery was "respectful of Ann's decision."  Neither of these letters mentioned the fact that Freedman's resignation was in fact driven by serious doubts about the authenticity and purported provenance of the Rosales Collection works.

123.   In connection with Freedman's termination, Hammer personally saw to it that Knoedler marked as "not for sale" all remaining Rosales Collection works in its inventory.  Hammer also directed employees not to speak about the Rosales Collection with any third parties.

28

124.     Thus, at Hammer's express direction, Knoedler made every effort to cover up the fact that it had sold fake Rosales Collection works to Taubman and to dozens of other victims.

**Knoedler's Business-as-Usual Communications with Taubman**

125.     Knoedler further sought to cover up its fraudulent sale to Taubman by continuing to correspond and do business with Taubman as if events subsequent to its 2005 sale of the Painting to Taubman had not given Knoedler every reason to suspect that the Painting was inauthentic.

126.     In or about March through June 2007, Knoedler, Freedman and Taubman negotiated Taubman's potential purchase of the Green Pollock.  Not only did Knoedler and Freedman fail, during these months of correspondence, to notify Taubman about the IFAR Report or about the evolution of the provenance story associated with the Green Pollock, but Knoedler and Freedman also failed to notify Taubman about the then-recent replacement of the Kemper Diebenkorn that, like the Green Pollock, Knoedler had originally acquired from Rosales.

127.     During these negotiations, on or about June 2, 2007, De Medeiros sent to the Taubmans an email containing a message from Freedman, dated May 31, 2007, in which Freedman stated, in the context of the sale of works of art, that "[Knoedler's] invoice is always [Knoedler's] legal guarantee."

128.     Taubman declined to purchase the Green Pollock.

129.     On or about May 15, 2010, Knoedler sold to Taubman a work by Milton Avery entitled "Riders in the Park."[9]  In a note to Taubman on Knoedler letterhead dated May 18, 2010, one of Knoedler's associate directors stated that "Riders in the Park" would be a "beautiful addition to [Taubman's art] collection."  Despite the fact that Knoedler was aware that Taubman's collection included a Rosales Collection work that Knoedler had every reason to suspect was inauthentic, Knoedler said nothing to Taubman about (i) the replacement of the Kemper Diebenkorn, (ii) Dedalus's conclusion that each of a series of Rosales Collection "Motherwells" was inauthentic, (iii) the fact that a federal grand jury had issued subpoenas to Knoedler and Freedman in connection with an investigation into the Rosales and Vijande Collections, or (iv) any other of the various red flags that had by then come to light with regard to the Rosales and Vijande Collections.

130.     Thus, in its business dealings with Taubman subsequent to the sale of the Painting, Knoedler continued to conceal information which would have led Taubman to investigate the authenticity of that work, instead taking care to reassure Taubman that it had no reason to suspect anything might be wrong with the Painting.

**2011-2013:  Defendants' Fraud Is Revealed**

*Killala Fine Art Limited Files Suit*

131.     In February 2011, more than six years after Taubman purchased the Painting from Knoedler, an Irish company filed a complaint in this Court in connection

---

[9.]     Rosales had no involvement in Knoedler's acquisition or sale of "Riders in the Park."

with its purchase of a Rosales Collection "Motherwell" from a small New York City art gallery owned and operated by a former employee of Knoedler, Julian Weissman ("Weissman").  Alleging that that work was in fact a forgery, the plaintiff in that action, Killala Fine Art Limited ("Killala"), asserted claims against both Weissman and Dedalus, the latter of which had issued a letter of authenticity for the work.[10]

132.    The complaint in the Killala lawsuit did not refer to Still or to any of the defendants in this action.

133.    On May 5, 2011, Dedalus filed an Answer and Crossclaims in the Killala lawsuit.  Among other things, that filing alleged that "[Weissman] and Ann Freedman, then President of Knoedler & Company, were obtaining paintings from a foreign born person named Glafira Rosales," and that "Glafira Rosales' husband or partner, Jose Carlos Bergantinos Diaz[,] had been accused publicly, as far back as 1999, of allegedly trafficking in forgeries."  That filing referred to the paintings coming from Rosales as the "David Herbert collection," suggested that this collection included works by "Pollock, Still, Kline, Rothko and others," and alleged that numerous art experts had expressed skepticism about the authenticity of those paintings.

134.    On information and belief, the first mention in the news media of the allegations asserted in Dedalus's Answer and Crossclaims — *i.e.*, the first news-

---

10.   *Killala Fine Art Ltd. v. Weissman*, No. 11 Civ. 0702 (complaint filed Feb. 1, 2011).  The Killala lawsuit was settled in October 2011, with Weissman (a) reimbursing Killala for the full purchase price of the purported Motherwell and (b) paying Dedalus's legal fees.

media reference to Freedman, Rosales or Diaz as potentially linked to forgeries sold by

Knoedler — occurred in or about July 2011.

135.    Prior to the Dedalus allegations coming to light in the news media

beginning in or about July 2011, Taubman neither knew nor had any reason to suspect

that Knoedler and Freedman had sold it a forgery.

***Taubman Investigates, Knoedler Closes, and Rosales and Diaz Are Indicted***

136.    In the summer of 2011, after reading an article discussing the

Dedalus allegations in the Killala lawsuit, Nicholas Taubman began to make inquiries

concerning the Painting.

137.    On November 10, 2011, art collector Pierre Lagrange presented

Knoedler with a copy of a forensics report demonstrating that a Rosales Collection

"Pollock" that Knoedler and Freedman had sold to Lagrange in 2007 was a forgery.  The

next day, Knoedler announced that it was shutting down permanently after more than

160 years of operation.  Knoedler was not scheduled to shut down its operations at that

time; indeed, it was in the middle of an exhibition and had recently undergone

renovations.

138.    In or about December 2012, Taubman retained the distinguished

forensic conservator James Martin ("Martin") of Orion Analytical, LLC ("Orion") to

conduct scientific testing of the Painting.

139.    Orion performs materials analysis, including of materials found in

works of fine art, for purposes of dating and authenticating works of fine art.

140.    Orion conducted a detailed examination and analysis of the Painting, and observed, among other things, that (a) the edges of the canvas had been artificially discolored with brown paint, which is uncharacteristic of Still's work and which has the effect of making the canvas appear older that it otherwise would; and (b) the Painting contains two pigments — Pigment Red 112 and Pigment Orange 34 — not commercially produced or marketed until several years after 1949 (the purported date of the painting).

141.    On May 20, 2013, Rosales was arrested and charged in a criminal complaint with tax fraud, among other things.  That criminal complaint alleged that Rosales had sold over 60 forged paintings to "two prominent Manhattan art galleries," one of which was clearly identifiable as Knoedler.  The Government's subsequently obtained Superseding Indictment characterized the distribution and sale of these forged paintings as a "conspiracy."

142.    On September 16, 2013, Rosales pled guilty to all nine counts in the Superseding Indictment.  At the plea hearing, Rosales's allocution confirmed the Government's allegations and defendants' fraud:

> From in or around the 1990s through 2009 . . . I agreed with others to sell works of art claimed to be created by various [E]xpressionist artists . . . and to make false representations as to the authenticity and provenance of those works.

143.    On April 18, 2014, Diaz and his brother Jesus Bergantiños Diaz were arrested by Spanish authorities in Seville, Spain.

33

144.    On April 21, 2014, the U.S. Attorney's Office for the Southern District of New York unsealed an indictment charging the two brothers with the same crimes as had been charged against Rosales, among other things, and also charging Qian with lying to the Federal Bureau of Investigation about his knowledge of and involvement in the forgery scheme.

145.    The Painting is in fact <u>not</u> an authentic work by Still.  Instead, it is a deliberate fake, created for the sole purpose of being passed off as an authentic Still.

146.    No Swiss art collector ever purchased the Painting directly from Still or Herbert, and no child of any such Swiss collector ever inherited the Painting.

147.    When Knoedler sent the Knoedler Invoice to Taubman, the Painting's "present owner" — *i.e.*, Knoedler — had <u>not</u> acquired it "by descent."

148.    The Painting is a worthless forgery.

**Defendants' Racketeering Scheme**

149.    As plaintiffs have subsequently learned, the fraud that defendants perpetrated on them was part of a fraudulent and unlawful scheme spanning well more than a decade.  The scheme involved defendants' production of numerous forged paintings, their sale of that forged artwork through Knoedler, and their deliberate and continuing concealment of facts and transactions that threatened to expose the scheme. At least seven other lawsuits are pending by customers who allege that defendants sold them forged artwork from the Rosales Collection.[11]  At least one other case arising out

---

11.     *De Sole v. Knoedler Gallery, LLC*, No. 12 Civ. 2313 (S.D.N.Y. complaint filed Mar. 28, 2012); *Howard v. Freedman*, No. 12 Civ. 5263 (S.D.N.Y. complaint filed July 6, 2012); *The Martin*

of defendants' sale of works from the Rosales Collection has settled on terms that are confidential and thus not available to the public.[12]

150.    Exhibit E hereto lists 40 Vijande and Rosales Collection works sold or offered for sale by Knoedler between 1994 and 2009.  All such sales were part of the same pattern of activity through which defendants defrauded plaintiffs and others.

151.    These transactions were immensely profitable for Knoedler, in part because Rosales made the works available for prices far below the market value for legitimate works by these artists.  For example:  in 2002, Knoedler purchased a purported Rothko from Rosales for $750,000.  That same year, Knoedler sold that painting for $5.5 million, a markup of 633%.  Similarly, according to Knoedler's records, in February 2007 Knoedler accepted a purported Lee Krasner work from Rosales on consignment, agreed to pay $80,000 to the "owner" of the work, and sold it later that same month for $1 million, a markup of 1,150%.

152.    Profits of this magnitude on either consigned or gallery-purchased works are highly unusual and, standing alone, indicate that Freedman, Knoedler, 8-31

---

*Hilti Family Trust v. Knoedler Gallery, LLC*, No. 13 Civ. 0657 (S.D.N.Y. complaint filed Jan. 29, 2013); *White v. Freedman*, No. 13 Civ. 1193 (S.D.N.Y. complaint filed Feb. 21, 2013); *Manny Silverman Gallery Inc. v. Knoedler Gallery, LLC*, No. 13 Civ. 8495 (S.D.N.Y. complaint filed Nov. 27, 2013); *Cohen v. Freedman*, No. 13 Civ. 8515 (S.D.N.Y. complaint filed Nov. 27, 2013); *Fertitta v. Knoedler Gallery, LLC*, No. 14 Civ. 2259 (S.D.N.Y. complaint filed Apr. 1 2014).  In addition, at least one case is pending against Weissman in connection with his sale of another work from the Rosales Collection.  *See Dar Noor Limited v. Weissman*, No. 653516/2012 (Sup. Ct. New York County complaint filed October 5, 2012).

[12.]  *Lagrange v. Knoedler Gallery, LLC*, No. 11 Civ. 8757 (S.D.N.Y. stipulation of voluntary dismissal filed Oct. 5, 2012).

and Hammer knew or should have known that the Rosales Collection works were not authentic.

153.     Gallery commissions on consigned works typically range from 10% to 20% above the sum payable to the original owner.  At times, dealers also purchase works as investments in the hope of selling them later at a profit; in such circumstances, the profit margin for a re-sale might exceed the typical range, but only at a far later date when the market for works by a particular artist had shifted.  A purchase price that permits a dealer to earn a very large profit in a short period of time — such as more than three or four times the purchase price in less than three years — is highly unusual and a red flag regarding the legitimacy of the transaction and the authenticity of the work.

154.     According to Knoedler's records, Knoedler sold ten Rosales Collection works while those works were on consignment from Rosales.  Knoedler sold each such work within seven months of its respective consignment agreement (and six of them within three months).  The *minimum* markup on these works was approximately 57%, with an *average* markup of over 275%.

155.     According to Knoedler's records, eleven times Knoedler sold a Rosales Collection work that it had purchased from Rosales less than three years earlier (eight of these had been purchased within the prior year).  Knoedler sold six of these for more than three times the amount it had paid for them, and four of them for more than four times as much.  With regard to the four such works purchased from Knoedler subsequent to the Green Pollock — each of which Knoedler and Freedman promoted

36

with a provenance story that included an intermediary — Knoedler sold *all* these for at least four times as much as it paid for them, and two for more than *seven* times as much.

156.   Thus, by industry standards, Rosales Collection sales were highly unusual and suspect.

157.   Freedman and Hammer were the principal beneficiaries of this windfall.  In 2002, Hammer personally saw to it that Freedman's compensation in the form of a share of Knoedler's profits was increased — from 16% to 25% — giving her a total annual compensation often topping $2 million.  All in all, between 1994 and 2008, Freedman received over $13 million in profit sharing, over $10 million of which — approximately 78% — was attributable to profits from Rosales Collection sales. Hammer reaped the rest of the windfall through 8-31, which on information and belief received regular profit distributions from Knoedler.  Hammer also personally received millions in profit-sharing during this period, the majority drawn from Rosales Collection profits.

158.   Rosales and Diaz also profited.  During this period, Knoedler paid approximately $15 million to Rosales and Diaz for Rosales Collection works that Knoedler sold.  The transfers to Rosales and Diaz consistently included $9,000 in cash delivered to Rosales and the lion's share of payments sent by wire to Diaz or his brother at a bank account in Spain.  Notably, no funds ever were transferred by Knoedler to any Swiss/Mexican seller or even into Switzerland or Mexico — yet another red flag.  And as Rosales has now admitted under oath, the funds Knoedler sent never were forwarded on to a "collector" — because no such "collector" existed.

159.    Knoedler also profited dramatically from the scheme.  As Freedman, Hammer and others at Knoedler knew, Knoedler's viability as a business was entirely dependent on these high-margin sales from the Rosales Collection.

160.    All told, between 1994 and 2011, Knoedler had a stated net profit of $29,564,240 (excluding a one-time gain following the sale of its building in 2011). Without the Rosales Collection sales, that net profit would have been a net *loss* of $3,204,061.  In other words, during the course of this scheme, *the only thing keeping Knoedler afloat was its fraudulent sale of the Rosales Collection works*.

161.    Indeed, after Hammer declared all Rosales Collection works "do not sell" — *i.e.*, once the Rosales Collection could not be relied on to prop up the business — Knoedler's profits promptly disappeared.  Knoedler incurred operating losses of $2.3 million in 2009 and $1.6 million in 2010.

**Hammer Was a Critical Part of the Racketeering Scheme**

162.    Hammer was a central and critical participant in and facilitator of defendants' racketeering scheme.  Hammer was and is the President and sole owner of 8-31, which is the sole member, sole owner and alter ego of Knoedler.  Hammer also was the Chairman of Knoedler itself and is currently the Sole Manager of Knoedler.  In his capacity as President of 8-31 and Chairman of Knoedler, Hammer had extensive knowledge of and participation in the racketeering scheme.

163.    Hammer was well aware both that the Rosales Collection profits were unusual and that his gallery's profits depended wholly on these suspicious sales:

a. Freedman has testified that she personally informed Hammer about all "significant" sales, specifically including each and every Rosales Collection sale. Freedman likewise confirmed that Hammer knew (i) that Rosales was the source of the Rosales Collection works; (ii) that these works were purportedly "newly discovered" with no established provenance; and (iii) that Knoedler was "researching" their purported provenance in an effort to bolster it.

b. Frank Del Deo, who worked closely with Freedman during the course of the scheme and then replaced her as Knoedler's President in 2009, has confirmed that Freedman and Hammer were "in close contact" and that Hammer learned about the Rosales Collection works from Freedman directly.

c. Howard Shaw, an executive of Hammer Galleries — Knoedler's sister gallery, also owned by 8-31 — has testified that he was aware of the "large" profits Knoedler was making on the Rosales Collection sales, was "surprised that someone could make such large profits on a painting," and found the situation "troubling." When he raised his concerns with another Hammer Galleries and 8-31 executive, Richard Lynch, he was assured that "Michael [Hammer] was aware" of the situation.

d. Hammer has testified that he attended 8-31 board meetings on an annual basis, at which meetings the "sales" and "expenses" of "each individual LLC" owned by 8-31 — including Knoedler — were reviewed. Hammer also admitted that he reviewed sales figures to "make sure that" the 8-31 companies "[we]re performing." Given that Knoedler's sales and profits during this period were so dominated by the Rosales Collection, even the most cursory review by Hammer would have immediately revealed that the gallery's profits depended almost entirely on suspiciously profitable sales of Rosales Collection works.

e. Hammer has stated, in a sworn declaration, that he was "directly responsible for the operations" of Knoedler.

164. Hammer also was directly and personally involved in a critical aspect of the scheme: the cover-up of the IFAR Report. As he testified, Hammer read the IFAR Report "very carefully," and understood that IFAR had raised "questions"

39

and "concerns" about the authenticity of the work at issue.  And Hammer testified that

he personally "insisted" that David Mirvish — who planned to partner with Knoedler

and Freedman in investing in the work and attempting to profit significantly from its

re-sale — be provided a copy of the Report, thereby securing funding for the scheme.

However, as Hammer admitted, he never took any further steps to ensure that innocent

potential purchasers of that work or of any other Rosales Collection work would be

provided a copy of the IFAR Report.

165.    Hammer also personally oversaw Freedman's compensation and

sweetened the pot for her as the scheme progressed, including raising her profit-sharing

in 2002 — shortly after she introduced Ossorio into the Rosales Collection provenance

story and sold the Green Pollock to Levy — from 16% to 25%, and then again in or

before 2008, from 25% to 30%.

166.    In sum, the scheme simply could not have succeeded without

Hammer.  Despite his awareness that Knoedler was engaged in the sale of dozens of

works he knew to be suspect, he allowed the scheme to progress, allowed Freedman to

use the venerable Knoedler name and property to lure in new victims, and called the

fraud to a halt only after he, Freedman, Knoedler and 8-31 already had made off with

tens of millions of dollars.

**Knoedler Is an Alter Ego of 8-31**

167.    8-31 and its principal subsidiaries, Knoedler and Hammer

Galleries, ignored the formal corporate distinctions among them.  Although 8-31,

Knoedler and Hammer Galleries purported to operate as separate corporate entities, 8-31 treated Knoedler as a mere instrumentality.

168.    Every 8-31 employee also had a position at Knoedler and/or Hammer Galleries.  Hammer served as President of 8-31 and Chairman of Knoedler.  Freedman was President of Knoedler and a Director of 8-31.  Ruth Blankschen ("Blankschen") was CFO of 8-31, Knoedler and Hammer Galleries (as was her predecessor, Sansone), and, while each of these entities paid 33% of Blankschen's salary, she did not track her time to determine whether that allocation was appropriate.

169.    8-31 had no offices separate from Knoedler's.  The building in which 8-31 employees worked housed the Knoedler Gallery and was owned by Knoedler, yet 8-31 did not pay rent to Knoedler for its use of space in that building.  8-31 employees used Knoedler email addresses.

170.    Knoedler did not maintain financial records separate and apart from 8-31's records.  Knoedler did not file its own tax returns and did not pay its own taxes.  8-31 issued Knoedler employees' paychecks and income tax forms.

171.    8-31 and Knoedler have consistently disregarded corporate formalities since their incorporation in 2001.

172.    Whenever 8-31 needed money, it directed that Knoedler or Hammer Galleries transfer funds to a single 8-31 account, in which such funds were commingled.  These transfers were carried out without loan documentation, interest charges, the galleries' receipt of consideration, or regard for the basis for 8-31's use of the funds.  Such transfers were repeatedly used to fund payment of 8-31's own

41

expenses, including Michael Hammer's annual salary (of approximately $400,000) and his "time and entertainment" expense reimbursements.

173.    As a result of these informal, interest-free transfers — which 8-31 referred to as "interdivisional receivables," thus acknowledging its technical obligation to repay the transferred funds — by 2012, 8-31 had built up indebtedness to Knoedler in a total amount of $23 million.

174.    Insofar as Knoedler's own profitability was dependent on the Rosales Collection sales, it follows that these transfers were almost exclusively funded by proceeds of the unlawful sales of forgeries.

175.    As 8-31 and Knoedler have now admitted, in 2010, 8-31 unilaterally reclassified the "interdivisional receivable" that 8-31 owed to Knoedler — at that time the largest asset on Knoedler's own books — as a distribution to 8-31.  In other words, 8-31 decreed that Knoedler would forgive tens of millions of dollars in "loans" that Knoedler had extended to 8-31 over the prior decade, without any consideration or recompense.

176.    Notably, this reclassification — which took Knoedler's largest asset off of its books — occurred just after the government began its investigation into the fraud at issue.  8-31 and Knoedler were well aware at this time that Knoedler was directly exposed to serious potential liability as a result of the Rosales Collection sales.

177.    In 2001, 8-31 prepared a Management Agreement with Knoedler, which both parties signed, and under which 8-31 was appointed to render certain services for Knoedler in return for an annual fee.  But while 8-31 has rendered many of

those services, it has never billed Knoedler, and Knoedler has never paid 8-31.

Blankschen, the CFO for both 8-31 and Knoedler, has admitted that she did not

consider, reference or enforce the Management Agreement in the performance of her

duties between 2007 and 2012.

178.    8-31 and Knoedler similarly disregarded corporate and contractual

formalities in connection with Knoedler's closing in November 2011.  A "liquidation

plan" adopted at the time by Knoedler and signed by Hammer required that Knoedler

reserve funds for potential liabilities arising from legal actions against Knoedler.  But 8-

31 and Knoedler ignored this directive as well.  Blankschen was not even informed

about the "liquidation plan," and Knoedler has not maintained a reserve for potential

liabilities.

179.    In disregarding corporate formalities and taking more than $23

million from Knoedler as described above, 8-31 and its president Hammer used their

domination of Knoedler to deplete Knoedler's assets and to shield themselves from the

consequences of their own wrongdoing.

## FIRST CAUSE OF ACTION

### (Fraud, against Knoedler, 8-31 and Freedman)

180.    Plaintiffs repeat and reallege the allegations contained in

Paragraphs 1 through 179 as if fully set forth herein.

181.    From February through November 2005, Knoedler and Freedman

fraudulently induced Taubman to purchase the Painting by making fraudulent

misrepresentations and omissions of material fact regarding the provenance and authenticity of the Painting.

182.   Knoedler and Freedman intentionally and materially misrepresented to Taubman — directly and through Taubman's agent, Westreich — that the Painting was an authentic painting by Still, that a Swiss art collector had purchased the Painting directly from Still with the assistance of David Herbert, and that the children of that collector owned the Painting and had acquired it by descent from their father; when in truth, the Painting was a forgery, no Swiss collector had purchased the Painting from Still, Herbert had never brokered the sale of the Painting from Still, and Knoedler owned the Painting.

183.   Knoedler and Freedman acted with intent to deceive Taubman into purchasing the Painting.

184.   Taubman relied on Knoedler's and Freedman's misrepresentations and omissions in purchasing the Painting.

185.   Taubman's reliance was justifiable and reasonable in light of, among other things, Knoedler and Freedman's superior knowledge and Knoedler's sterling 165-year-old reputation as one of the world's finest art galleries.

186.   Taubman would not have purchased the Painting if it had known that Knoedler's and Freedman's representations were false, or if Knoedler and Freedman had disclosed all material facts.

44

187.     Due to the concealment of material facts until only recently, Taubman was unaware and could not have been aware of Knoedler and Freedman's fraud.

188.     Freedman, personally, is liable for fraud because she directly made the fraudulent misrepresentations and omissions.

189.     Knoedler is liable for fraud because Freedman made the fraudulent misrepresentations and omissions in her capacity as the President of Knoedler, and because Knoedler issued an invoice to Taubman containing the misrepresentations.

190.      8-31 is liable as Knoedler's alter ego and under the doctrine of *respondeat superior*.

191.     Knoedler's and Freedman's fraudulent misrepresentations and omissions damaged plaintiffs in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the fraud, and interest thereon.

192.     In addition, because Knoedler and Freedman engaged in the fraudulent conduct stated in this Complaint willfully, maliciously and with the intent to damage Taubman, plaintiffs are entitled to an award of punitive damages.

193.     By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler, 8-31 and Freedman for damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

**(Fraudulent Concealment, against Knoedler, 8-31 and Freedman)**

194.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 193 as if fully set forth herein.

195.   Knoedler and Freedman had a duty to disclose to Taubman, and not to conceal from it, material facts relating to the Painting, based on their superior knowledge concerning factors relating to the authenticity, provenance and marketability of that artwork.

196.   Knoedler and Freedman fraudulently concealed from Taubman — both directly and through Taubman's agent, Westreich — facts about which Knoedler and Freedman had superior knowledge, which facts were not readily available to Taubman, and Knoedler and Freedman intended and understood that Taubman would purchase the Painting on the basis of the incomplete and incorrect information that Knoedler and Freedman provided to Taubman.

197.   Among other things, Knoedler and Freedman did not tell Taubman or Westreich that:

(a)   Knoedler owned the Painting;

(b)   the Painting had been delivered to Knoedler by Rosales;

(c)   neither Freedman nor anyone else at Knoedler had ever seen any evidence substantiating the provenance story Rosales provided for the Painting (*e.g.*, any evidence that Mr. X or his children ever existed, or that Herbert had ever facilitated a sale directly from Still to a collector);

(d)   neither Freedman nor anyone else at Knoedler even knew the name of Mr. X or his children;

46

(e)  the Diebenkorn family and estate had expressed doubts about the authenticity of works that Rosales had brought to Knoedler;

(f)  Rosales had initially identified Ossorio as having facilitated the sale of works to Mr. X, but there was no record of Ossorio having any connection with any Rosales Collection works;

(g)  questions and doubts raised by IFAR about the authenticity and provenance of another work from the Rosales Collection had led to the cancellation of Knoedler's sale of that work; and

(h)  the vast preponderance of sale proceeds paid by Knoedler to Rosales for the Painting — and for other Rosales Collection works — would be paid to the Spanish brother of Diaz.

198.  If Taubman had known the facts that Knoedler and Freedman fraudulently concealed from it, it would not have purchased the Painting.

199.  Taubman could not have discovered the undisclosed facts on its own because only defendants both had access to them and knew of their relevance to the Painting.

200.  Knoedler and Freedman knew the truth about the Painting's provenance — that it had no known source other than Rosales — and hid this fact from Taubman.

201.  The truth about the Painting's provenance renders the Painting worthless.

202.  Because Knoedler and Freedman failed to provide Taubman with the complete facts at their disposal, Taubman purchased the Painting — as Knoedler and Freedman intended.

203.     Freedman, personally, is liable for fraudulent concealment because she made the fraudulent omissions.

204.     Knoedler is liable for fraudulent concealment because Freedman made the fraudulent omissions in her capacity as the President of Knoedler.

205.     8-31 is liable as Knoedler's alter ego and under the doctrine of *respondeat superior*.

206.     Knoedler and Freedman's fraudulent concealment damaged plaintiffs in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the fraud, and interest thereon.

207.     In addition, because Knoedler and Freedman engaged in their fraudulent concealment conduct willfully, maliciously and with the intent to damage plaintiffs, plaintiffs are entitled to punitive damages.

208.     By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler, 8-31 and Freedman for damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

**(Aiding and Abetting Fraud, against 8-31, Hammer, Rosales and Diaz)**

209.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 208 as if fully set forth herein.

210.     Defendants Knoedler and Freedman perpetrated a fraud on Taubman, as set out in Paragraphs 180 through 208.

48

211.   8-31, Hammer, Rosales and Diaz had actual knowledge of that fraud or consciously avoided knowledge of that fraud.

212.   Rosales and Diaz had knowledge of, and provided substantial assistance to, the fraud by virtue of their having (i) engaged and paid Qian to create the Rosales Collection works, including the Painting; (ii) artificially "aged" the Rosales Collection works, including the Painting, to enhance their apparent authenticity; (iii) associated the Rosales Collection works, including the Painting, with an invented provenance story; and (iv) provided, for compensation, the Rosales Collection works, including the Painting, to Knoedler for fraudulent re-sale.

213.   Hammer had personal knowledge of the fraud by virtue of his having (i) carefully reviewed the IFAR Report, which called into question the authenticity and provenance of all Rosales Collection works, including the Painting; (ii) reviewed documents demonstrating Knoedler's inability to substantiate the purported provenance of the Rosales Collection works, including the Painting; and (iii) been contemporaneously aware of Knoedler's acquisition and sale of each Rosales Collection work, including the Painting, including the unusually low amount Knoedler paid to acquire each such work and the unusually outsized profit Knoedler made on each such work.

214.   Hammer, personally, provided substantial assistance to the fraud by (i) condoning Freedman's use of Knoedler's name and reputation in aid of her fraudulent misrepresentations and omissions, (ii) rewarding and incentivizing Freedman's fraudulent sales by increasing her profit sharing in 2002 and again in or

49

before 2008; (iii) directing that Knoedler share the IFAR Report with David Mirvish but not with any other prospective purchaser of a Rosales Collection work; and (iv) directing the concealment of the fraudulent scheme after its conclusion.

215.   8-31 is liable for aiding and abetting fraud because Hammer provided substantial assistance to the fraud in his capacity as the President of 8-31.

216.   The actions of 8-31, Hammer, Rosales and Diaz in enabling and assisting the fraud proximately caused damage to plaintiffs in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the fraud, and interest thereon.

217.   In addition, because 8-31, Hammer, Rosales and Diaz engaged in their conduct willfully and maliciously with the intent to damage plaintiffs, plaintiffs are entitled to punitive damages.

218.   By reason of the foregoing, plaintiffs are entitled to judgment against defendants 8-31, Hammer, Rosales and Diaz for damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Conspiracy to Commit Fraud, against 8-31, Hammer, Rosales and Diaz)

219.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 218 as if fully set forth herein.

220.   Knoedler and Freedman perpetrated a fraud on Taubman, as set out in Paragraphs 180 through 208.

221.    Along with Knoedler and Freedman, defendants 8-31, Hammer, Rosales and Diaz maintained a corrupt agreement and enterprise the purpose of which was to knowingly misrepresent the provenance and authenticity of forgeries, including the Painting, in order to defraud numerous victims, including Taubman.

222.    A corrupt agreement among the defendants is apparent by virtue of (i) Diaz and Rosales's cooperation in commissioning the creation of forgeries, enhancing those forgeries' apparent authenticity, and introducing those forgeries to the market; (ii) Rosales and Freedman's numerous meetings to discuss and flesh out the provenance stories that Knoedler and Freedman would fraudulently associate with each of the forgeries; and (iii) Freedman and Hammer's regular discussions regarding the sale of each of the forgeries, the source of the forgeries, and the failure of Knoedler's research to substantiate those forgeries' purported provenance.

223.    Diaz committed overt acts in furtherance of the conspiracy by soliciting Qian's creation of forgeries and by artificially aging those forgeries to enhance their apparent authenticity.

224.    Rosales committed overt acts in furtherance of the conspiracy by introducing those forgeries to the market by providing them to Knoedler and Freedman and by falsely misrepresenting those forgeries' provenance both orally and in writing.

225.    Hammer, personally, committed overt acts in furtherance of the conspiracy by (i) condoning Freedman's use of Knoedler's name and reputation in aid of her fraudulent misrepresentations and omissions; (ii) rewarding and incentivizing Freedman's fraudulent sales by increasing her profit sharing in 2002 and again in or

before 2008; (iii) directing that Knoedler share the IFAR Report with David Mirvish but not with any other prospective purchaser of a Rosales Collection work; and (iv) directing Knoedler's concealment of the fraudulent scheme after its conclusion.

226.   8-31 is liable for conspiracy to commit fraud because Hammer participated in the conspiracy in his capacity as the President of 8-31.

227.   As a result of the conspiracy to commit fraud, plaintiffs have been damaged in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the fraud, and interest thereon.

228.   In addition, because defendants engaged in their conduct willfully and maliciously with the intent to damage plaintiffs, plaintiffs are entitled to punitive damages.

229.   By reason of the foregoing, plaintiffs are entitled to judgment against 8-31, Hammer, Rosales and Diaz for damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (RICO -- Violation of 18 U.S.C. § 1962(c), against all Defendants)

230.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 229 as if fully set forth herein.

231.   Each defendant is a "person" as that term is defined by 18 U.S.C. § 1961(3).

232.     Defendants formed an association-in-fact that constituted an enterprise, as that term is defined by 18 U.S.C. § 1961(5), that engaged in, and the activities of which affected, interstate commerce.

233.     The association-in-fact existed for defendants' common purpose of selling counterfeit artwork for approximately 15 years, allowing defendants to reap millions of dollars in profits.

234.     Each defendant was essential to, and participated in the operation and management of, the association-in-fact enterprise.

235.     Diaz and Rosales commissioned the forgeries, enhanced the forgeries' apparent authenticity through artificial aging and the invention of false provenance stories, introduced the forgeries to the market, and worked with the other defendants to elaborate on the Rosales Collection provenance story.

236.     Freedman organized and executed the sale of the forged works to unsuspecting victims, using her position as President of Knoedler and her reputation in the art world to induce collectors to buy the forged artwork.  She also worked with the other defendants to elaborate on the Rosales Collection provenance story, directed the research performed by defendants in their attempts to substantiate those elaborations, and sought to cover up defendants' scheme by adding memoranda to the Rosales File in order to explain away each change to the provenance story and each suspicious fact that came to light.

237.     Knoedler used its name and reputation to attract purchasers and ensure that purchasers trusted the false representations made.

238.     Hammer encouraged and enabled the enterprise by (i) permitting Freedman's use of Knoedler's name and reputation to fraudulently sell forgeries, when he knew that those paintings had a highly suspicious backstory and were generating unheard-of profits; (ii) rewarding and incentivizing those sales by increasing Freedman's profit sharing in 2002 and again in or before 2008; and (iii) affirmatively acting to ensure the ongoing viability of the enterprise by directing that Knoedler share the IFAR Report with David Mirvish but not with any other prospective purchaser of a Rosales Collection work.

239.     8-31 participated in the operation and management of the racketeering scheme as Knoedler's alter ego and through the knowing participation of its President, Hammer, and its employee, Freedman.

240.     Defendants' scienter is established by the pattern of fraudulent misrepresentations and omissions described above.

241.     All defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961 (1), (4) and (5) and in violation of 18 U.S.C. § 1962(c), by engaging in acts indictable under Title 18, United States Code, § 1341 (mail fraud) and § 1343 (wire fraud).  For example:

> (a)     On or about April 6, 2000, Freedman, Knoedler and Hammer caused Frances Hamilton White and her husband at the time (collectively, the "Whites") to use mail communications in interstate commerce to mail a check for $5 million to Knoedler for the purpose of purchasing a Rosales Collection work that defendants falsely represented to be an authentic work by Pollock (the "White Pollock").

(b)     On or about April 8, 2000, in connection with the sale of the White Pollock, Freedman, Knoedler and Hammer used mail communications in interstate commerce to mail to the Whites, among other things, the White Pollock and an invoice containing the fraudulent misrepresentation that the forged White Pollock was an authentic work by Pollock.

(c)     On or about January 9, 2002, Knoedler, Rosales and Diaz used wire communications in foreign commerce to transfer $711,000 to an account in Spain for the purpose of having Knoedler acquire a Rosales Collection "Rothko."

(d)     In or about late October 2002, Freedman used wire communications to induce The Martin Hilti Family Trust (the "Hilti Trust") to purchase a Rosales Collection work that defendants falsely represented to be an authentic work by Rothko (the "Hilti Rothko").

(e)     On or about November 6, 2002, November 7, 2002, November 8, 2002, November 12, 2002 and November 13, 2002, Knoedler used wire communications in foreign commerce to encourage and enable the Hilti Trust to pay, and to receive from the Hilti Trust, $5.5 million in exchange for the forged Hilti Rothko.

(f)     In or about late November 2004, Knoedler and Freedman used wire communications in interstate commerce to negotiate the sales price of a Rosales Collection work (the "De Sole Rothko"), which defendants had falsely represented was an authentic work by Rothko, with the consultant and agent of Domenico and Eleanore De Sole (collectively, the "De Soles").

(g)     On or about November 30, 2004, Knoedler and Freedman used mail communications in interstate commerce to mail to the De Sole's consultant and agent an invoice containing the fraudulent misrepresentation that the De Sole Rothko was an authentic work by Rothko and fraudulent misrepresentations concerning the provenance of that work.

(h)     On or about December 11, 2004, Knoedler and Freedman used mail communications in interstate commerce to mail to the De Soles a letter containing the fraudulent misrepresentation that the De Sole Rothko was an authentic

work by Rothko, and providing further fraudulent misrepresentations concerning the provenance of that work.

(i)      On or about December 17, 2004, Knoedler and Freedman used wire communications in interstate commerce to facilitate and cause the transmission by the De Soles, through their consultant and agent, of a wire of $8.3 million to Knoedler for the purpose of purchasing the forged De Sole Rothko.

(j)      On or about June 11, 2007, Knoedler, Rosales and Diaz used wire communications in foreign commerce to transfer $711,000 to an account in Spain for the purpose of having Knoedler acquire a forged Rosales Collection work in order to sell it as an authentic work by de Kooning (the "Howard de Kooning").

(k)      On or about June 13, 2007, Knoedler and Freedman used wire communications in interstate commerce to email to an intermediary for John D. Howard ("Howard"), an invoice containing the fraudulent misrepresentation that the Howard de Kooning was an authentic work by de Kooning and fraudulent misrepresentations concerning the provenance of that work.

(l)      On or about June 13, 2007, Knoedler and Freedman used wire communications in interstate commerce to facilitate and cause the transmission by an intermediary for Howard of a wire of $3.5 million to Knoedler for the purpose of purchasing the forged Howard de Kooning, which Knoedler and Freedman had falsely represented was an authentic work by de Kooning.

(m)      On numerous other dates and occasions, defendants used domestic and international wires to make similar payments to or for the benefit of Rosales and Diaz and to receive funds from and communicate with customers who purchased from Knoedler forged works of art from the Rosales Collection.

242.      Each of the foregoing predicate acts was essential to and furthered defendants' fraudulent racketeering scheme, and defendants knew or reasonably should have expected that these acts were essential to and furthered their scheme.

243.    The acts and pattern of conduct set forth above constitute violations of 18 U.S.C. §§ 1341 and 1343, in that defendants devised and intended to devise a scheme and artifice to commit multiple frauds on, and to obtain money and property from, plaintiffs and several other victims by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme and artifice and attempting to do so, defendants used and caused to be used the United States mails and wires.

244.    Defendants' foregoing acts of mail and wire fraud constitute racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

245.    Through their association-in-fact enterprise, defendants committed similar racketeering activities and predicate acts against a number of other victims with the same intent to defraud.

246.    The foregoing acts had the same or similar purposes, results, participants or methods of commission, and are interrelated by distinguishing characteristics and were not isolated events.

247.    These acts occurred during the period beginning no later than 1994 and continued at least through 2009, although the fraudulent nature of the acts was not discovered by plaintiffs until recently because of defendants' successful fraudulent concealment.

248.    The commission of these related predicate acts over the period of time alleged, with the intent and effect of defrauding plaintiffs and other victims,

constituted a continuous and interwoven pattern of racketeering activity as defined in

18 U.S.C. §1961(1) and (5).

249.    Defendants engaged in a closed-end pattern of racketeering activity

in that they engaged in a series of related predicate acts that extended throughout a

period of approximately fifteen years.

250.    The pattern of racketeering activities proximately caused plaintiffs'

injury.

251.    As a direct and proximate result of defendants' conduct of the

affairs of the enterprise through a pattern of racketeering activity, plaintiffs have

suffered a loss to their business or property in the amount of at least $4.3 million, the

amount paid for the Painting, which is worthless, together with costs and expenses

related to the discovery of the fraud, and interest thereon.

252.    By reason of the foregoing, plaintiffs are entitled to recover from

defendants, jointly and severally, treble damages, together with all costs of this action

plus reasonable attorney's fees, all as provided under 18 U.S.C. § 1964(c).

### SIXTH CAUSE OF ACTION

**(RICO Conspiracy -- Violation of 18 U.S.C. § 1962(d),
against all Defendants)**

253.    Plaintiffs repeat and reallege the allegations contained in

Paragraphs 1 through 252 as if fully set forth herein.

254.    In violation of 18 U.S.C. § 1962(d), defendants conspired with each

other to commit a violation of 18 U.S.C. § 1962(c), by knowingly agreeing and

conspiring to directly or indirectly conduct or participate in the affairs of an enterprise through the pattern of racketeering activity described in Paragraphs 230 through 252.

255.    The conspiracy commenced among defendants by no later than 1994, and each defendant committed essential and overt acts in furtherance of the agreement to commit two or more fraudulent and illegal racketeering acts.

256.    Each defendant was aware of the nature of the conspiracy and that the conspiracy extended beyond each defendant and involved the other defendants.

257.    As a direct and proximate result of the above-described conspiracy, plaintiffs have been injured in their business and property in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the fraud, and interest thereon.

258.    By reason of the foregoing, plaintiffs are entitled to recover from defendants, jointly and severally, treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided under 18 U.S.C. § 1964(d).

<u>**SEVENTH CAUSE OF ACTION**</u>

**(Breach of Warranty, against Knoedler and 8-31)**

259.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 258 as if fully set forth herein.

260.    Prior to and at the time of the sale of the Painting, Knoedler expressly represented to Taubman — both directly and through Taubman's agent, Westreich — that the Painting was created by Still in 1949 and that the Painting was obtained from a private collection in Switzerland.

261.    These representations constitute express warranties pursuant to New York Uniform Commercial Code § 2-313.

262.    Taubman, which possessed no special knowledge of art authenticity, relied on these warranties by Knoedler in deciding to purchase the Painting.  Taubman would not have purchased the work if it had known these representations were false.

263.    Knoedler breached these express warranties in that these representations were false.  The Painting is not an authentic work by Still, and the Painting came from the Rosales Collection and was not part of a private collection in Switzerland.

264.    8-31 is liable as Knoedler's alter ego.

265.    As a result of Knoedler's breach of express warranties, plaintiffs have suffered damages in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the breach, and interest thereon.

266.    The doctrine of equitable tolling applies to Knoedler's breach of warranty.  After Taubman's purchase of the Painting, Knoedler made at least three representations to Taubman designed to prevent Taubman's discovery of its claim.

267.    First, on or about June 2, 2007, Freedman stated in an email to Taubman, in the context of the sale of works of art, that "[Knoedler's] invoice is always [Knoedler's] legal guarantee."  Freedman thus sought to reassure Taubman that

Taubman had no reason to doubt any representation made on a Knoedler invoice, such as those made by Knoedler two years earlier on the Invoice.

268. Second, on or about October 27, 2009, Hammer — in his capacity as Chairman of Knoedler — sent a letter to Knoedler customers, including Westreich, Taubman's art advisor, announcing that Freedman had "resigned" from Knoedler. Hammer's letter was attached to a cover letter from Freedman's replacement, Frank Del Deo, stating that the gallery was "respectful of Ann's decision." However, these letters made no mention of the fact that Freedman had not simply "decided" to "resign," but rather was being pushed out as a direct result of serious questions that had been raised about the authenticity of Rosales Collection works, such as the Painting. This was part of a concerted effort of Hammer, Knoedler and others to ensure that no connection would be drawn between Freedman's abrupt departure from Knoedler and problems with the Rosales Collection. As part of this effort and to ensure that the fraud would not be revealed, Hammer and Knoedler lied to Taubman and their other customers about the circumstances of Freedman's departure.

269. Third, on or about May 15, 2010, in connection with Taubman's purchase from Knoedler of Milton Avery's "Riders in the Park," Knoedler sent to Taubman a written note, stating that that work would be a "beautiful addition to [Taubman's art] collection." By this time Knoedler knew that the Kemper Museum had replaced the Kemper Diebenkorn, that Dedalus had deemed numerous works in the Rosales Collection fakes, and that a federal grand jury had issued subpoenas to Knoedler and Freedman in connection with an investigation into the Rosales and

61

Vijande Collections.  But Knoedler also knew that if it revealed these or other red flags pertinent to the value of the Painting, Taubman would become aware of a potential claim against the gallery.  For that reason, Knoedler referred to Taubman's art collection in such a way as to reassure Taubman that it had no reason to suspect anything might be wrong with any of its contents, including the Painting.

270.    Knoedler's scheme was also inherently self-concealing.  There was no way for Taubman or any other victim to ascertain the accuracy of Knoedler's warranties, and Knoedler intentionally concealed all information that would place a purchaser on notice that there were serious concerns with the Rosales Collection works (including the numerous red flags discussed above).  Indeed, given that this scheme managed to endure over a long period of time, the damning truth about the Rosales Collection — including its true origins — was necessarily concealed.

271.    As a direct result of Knoedler's intentional concealment of material facts in its possession to prevent Taubman from discovering that the representations that Knoedler warranted as true were in fact false, plaintiffs were induced not to suspect any wrongdoing in connection with the sale, not to conduct an investigation into the Painting's authenticity sooner and not to commence this action sooner.

272.    By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler and 8-31 for damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Violation of § 13.01 of the N.Y. Arts and Cultural Affairs Law, against Knoedler and 8-31)

273.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 272 as if fully set forth herein.

274.    At all relevant times, Knoedler was an art merchant within the meaning of § 13.01 of New York Arts and Cultural Affairs Law.

275.    Taubman was not an art merchant within the meaning of § 13.01 of New York Arts and Cultural Affairs Law.

276.    Pursuant to § 13.01 of New York Arts and Cultural Affairs Law, the Invoice created an express warranty by Knoedler that the Painting was an authentic work by Still created in 1949 and that the Painting was obtained from a private collection in Switzerland.

277.    Pursuant to § 13.01 of New York Arts and Cultural Affairs Law, this warranty were part of the basis of the bargain as a result of which Taubman paid $4.3 million in exchange for the Painting.

278.    Knoedler breached this express warranty in that the representations were false.  The Painting is not an authentic work by Still, and the Painting came from the Rosales Collection and was not part of a private collection in Switzerland.

279.    8-31 is liable as Knoedler's alter ego.

280.     As a result of defendants' violation of § 13.01 of New York Arts and Cultural Affairs Law, plaintiffs have suffered damages in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the breach, and interest thereon.

281.     Equitable tolling applies to this Claim for the reasons stated in Paragraphs 266 through 271.

282.     By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler and 8-31 for damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Breach of Implied Warranty, against Knoedler and 8-31)

283.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 282 as if fully set forth herein.

284.     At all relevant times, Knoedler was a merchant with respect to fine art within the meaning of New York Uniform Commercial Code § 2-314.

285.     In connection with the sale of the Painting, Knoedler impliedly warranted that the Painting would be merchantable, which required, among other things, that the Painting would pass without objection in the trade under the contract description and would conform to the promises or affirmations of fact made on the Invoice.  Taubman, which possessed no special knowledge of art authenticity, relied on Knoedler, as a merchant with respect to fine art, in deciding to purchase the Painting.

Taubman would not have purchased the work if it had known that the Painting was not merchantable.

286.    Knoedler breached the implied warranty of merchantability in that, among other things, the Painting cannot be sold without objection in the art market as an authentic work by Still, and the Painting does not conform to the affirmations of fact made on the Invoice, because it is not an authentic work by Still and because the Painting came from the Rosales Collection, not from a private collection in Switzerland.

287.    8-31 is liable as Knoedler's alter ego.

288.    As a result of Knoedler's breach of implied warranty, plaintiffs have suffered damages in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the breach, and interest thereon.

289.    Equitable tolling applies to this Claim for the reasons stated in Paragraphs 266 through 271.

290.    By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler and 8-31 for damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Unilateral Mistake, against Knoedler and 8-31)

291.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 290 as if fully set forth herein.

292.    At the time that Taubman purchased the Painting, it believed that the Painting was an authentic painting by Still.

293.    Taubman's unilateral mistake of fact was fundamental to its agreement to purchase the Painting, and was induced by Knoedler's fraudulent misrepresentations and omissions with respect to the authenticity and provenance of the Painting.

294.    8-31 is liable as Knoedler's alter ego.

295.    Taubman has suffered damages in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the fraud, and interest thereon.

296.    Equitable tolling applies to this Claim for the reasons stated in Paragraphs 266 through 271.

297.    By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler and 8-31 for rescission of the agreement pursuant to which Taubman purchased the Painting from Knoedler and for damages in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION

**(Mutual Mistake, against Knoedler and 8-31)**

298.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 297 as if fully set forth herein.

299.    At the time that Taubman purchased the Painting, it believed that the Painting was an authentic painting by Still.

66

300.   To the extent that Knoedler may be found to have mistakenly believed that the Painting was an authentic painting by Still, Knoedler's sale of the Painting to Taubman, and Taubman's purchase of the Painting from Knoedler, was the result of a mutual mistake of fact fundamental to the parties' agreement.

301.   8-31 is liable as Knoedler's alter ego.

302.   Taubman has suffered damages in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the mistake, and interest thereon.

303.   Equitable tolling applies to this Claim for the reasons stated in Paragraphs 266 through 271.

304.   By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler and 8-31 for rescission of the agreement pursuant to which Taubman purchased the Painting from Knoedler and for damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

**(Violation of §§ 349 and 350 of the New York General Business Law, against Knoedler, 8-31 and Freedman)**

305.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 304 as if fully set forth herein.

306.   Knoedler and Freedman made materially misleading or deceptive misrepresentations and omissions of fact to Taubman in discussions and negotiations concerning the Painting, including those that took place at the ADAA Art Show and

elsewhere in New York, in violation of § 349 and § 350 of the New York General Business Law.

307.     Knoedler and Freedman materially misrepresented and falsely advertised that the Painting was an authentic Still painting, and failed to disclose material facts regarding the Painting's provenance.

308.     Taubman was deceived by Knoedler and Freedman's misrepresentations, omissions and deceptive acts and practices in New York, which Knoedler and Freedman committed in the conduct of their business, trade or commerce in this State.

309.     A reasonable consumer in Taubman's circumstances, acting reasonably under the circumstances, would likely have been misled by Knoedler and Freedman's misconduct.

310.     Knoedler and Freedman's misconduct in connection with the sale of the Painting was "consumer-oriented," in that the same misconduct was directed at and affected similarly situated consumers in connection with defendants' sales of other paintings from the Rosales Collection.

311.     8-31 is liable as Knoedler's alter ego and under the doctrine of *respondeat superior*.

312.     As a result of Knoedler's and Freedman's violations of §§ 349 and 350 of the New York General Business Law, plaintiffs were injured in the amount of at least $4.3 million, the amount paid for the Painting, which is worthless, together with costs and expenses related to the discovery of the deception, and interest thereon.

313.   Equitable tolling applies to this Claim for the reasons stated in Paragraphs 266 through 271.

314.   By reason of the foregoing, plaintiffs are entitled to judgment against defendants Knoedler, 8-31 and Freedman for damages in an amount to be determined at trial.

## DEMAND FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

(a)   On the First Cause of Action, damages in favor of plaintiffs and against defendants Knoedler, 8-31 and Freedman, including punitive damages, in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the fraud;

(b)   On the Second Cause of Action, damages in favor of plaintiffs and against defendants Knoedler, 8-31 and Freedman, including punitive damages, in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the fraud;

(c)   On the Third Cause of Action, damages in favor of plaintiffs and against defendants 8-31, Hammer, Rosales and Diaz, including punitive damages, in an amount to be determined at trial but in no event less than $4.3 million, together with costs and expenses related to the discovery of the fraud;

(d)   On the Fourth Cause of Action, damages in favor of plaintiffs and against defendants 8-31, Hammer, Rosales and Diaz, including punitive damages, in an

amount to be determined at trial but in no event less than $4.3 million, together with costs and expenses related to the discovery of the fraud;

(e)     On the Fifth Cause of Action, damages in favor of plaintiffs and against all defendants in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the racketeering activity, trebled;

(f)     On the Sixth Cause of Action, damages in favor of plaintiffs and against all defendants in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the racketeering conspiracy, trebled;

(g)     On the Seventh Cause of Action, damages in favor of plaintiffs and against defendants Knoedler and 8-31 in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the breach;

(h)     On the Eighth Cause of Action, damages in favor of plaintiffs and against defendants Knoedler and 8-31 in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the violation;

(i)     On the Ninth Cause of Action, damages in favor of plaintiffs and against defendants Knoedler and 8-31 in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the breach;

70

(j)     On the Tenth Cause of Action, rescission of the agreement pursuant to which Taubman purchased the Painting from Knoedler and damages in favor of plaintiffs and against defendants Knoedler and 8-31 in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the mistake;

(k)     On the Eleventh Cause of Action, rescission of the agreement pursuant to which Taubman purchased the Painting from Knoedler and damages in favor of plaintiffs and against defendants Knoedler and 8-31 in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the mistake;

(l)     On the Twelfth Cause of Action, damages in favor of plaintiffs and against defendants Knoedler, 8-31 and Freedman in an amount to be determined at trial, but in no event less than $4.3 million, together with costs and expenses related to the discovery of the deception;

(m)     Prejudgment interest on the foregoing amounts;

(n)     The costs and disbursements of this action, including reasonable attorneys' fees; and

(o)     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:   New York, New York
         April 29, 2014

                                    HUGHES HUBBARD & REED LLP

                                    By: _____
                                        Daniel H. Weiner
                                        Webster D. McBride
                                    One Battery Park Plaza
                                    New York, New York 10004-1482
                                    (212) 837-6000
                                    weiner@hugheshubbard.com
                                    mcbridew@hugheshubbard.com

                                    Attorneys for Plaintiffs

63005171

72